Fiorello v. Hewlett-Packard          CV-03-282-SM   12/22/04
                    UNITED STATES DISTRICT COURT

                       DISTRICT OF NEW HAMPSHIRE


Michael J. Fiorello,
        Plaintiff

        v.                               Civil No. 03-282-SM
                                         Opinion No. 2004 DNH 184
Hewlett-Packard Company
d/b/a Hewlett-Packard
Company, Incorporated,
        Defendant


                         **O R D E R**


        Michael Fiorello, a Hewlett-Packard Company inside sales

representative, is suing the company for breach of contract in

connection with an in-house sales promotion program.

Specifically, Fiorello asserts that Hewlett-Packard owes him

$100,000, the full amount offered in the promotion, rather than

the ten-percent share he was awarded.  Before the court is

defendant's motion for summary judgment.  Plaintiff objects, both

on the merits and on grounds that additional discovery is

necessary.  See Fed. R. Civ. P. 56(f).  On the record as currently

developed, defendant's motion for summary judgment is necessarily

denied.

## Summary Judgment Standard

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)). When ruling on a party's motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003) (citing Rivera v. P.R. Acqueduct & Sewers Auth., 331 F.3d 183, 185 (1st Cir. 2003)).

## Background

The following facts are undisputed by the parties. Michael Fiorello was employed by Hewlett-Packard as an inside sales representative. During the second quarter of Hewlett-Packard's 2000 fiscal year (February 1, 2000, through April 30, 2000),

Hewlett-Packard put an incentive program in place for its sales representatives, titled "North America – $100,000 K Performance Plus Bonus." (Def.'s Mot. Summ. J., Caola Aff., Ex. 1 at 3.) According to a Hewlett-Packard web site,[1] the program was to operate as follows:

> It is designed for quota carrying sales representatives in North America. **Participation requires greater than or equal to 150% of Q2 quota performance or a $2.5 million win over SUN.** From this pool of top performers, Mike Cox will randomly select one winner. This winner will be awarded $100,000 shortly after the close of the second quarter.
>
> . . .
>
> Every qualified SR who finishes at or above 150% of quota for the 2nd quarter will receive an entry into the $100,000 drawing. Achievement of even higher levels of performance for the quarter will earn additional entries. . . .
>
> . . .
>
> PROGRAM RULES:
>
> . . .
>
>    \*    If the winner is a member of a team (with team quota) that consistently splits orders at a predetermined rate, the $100,000 award will be split among team members. The split

---

[1] That the details of the promotion were posted on the web site is evidenced by two print-outs dated April 18, 2000, and May 9, 2000. (See Def.' Mot. Summ. J., Caola Aff., Exs. 1 and 2.)

> ratio applied to orders will be applied to
> the $100,000 award.

(Def.'s Mot. Summ. J., Caola Aff., Ex. 1 at 3 (emphasis in the original.)

Fiorello first became aware of the bonus program on May 16, 2000, after the close of the second quarter, when a colleague told him about it. The drawing was held on May 18, 2000, and Fiorello's name was drawn as the $100,000 winner.[2] The day after the drawing, Fiorello looked at a company web site which announced that he had won the $100,000 award, and that he was to share it with his sales team. Subsequently, Fiorello was awarded $10,000, while five outside sales representatives (alleged team members) were each awarded $18,000.[3] Dissatisfied, Fiorello filed this suit, claiming that he was entitled to the full $100,000.

---

[2] During the quarter in question, plaintiff's sales amounted to 178 percent of his assigned quota. (Pl.'s Mot. Summ. J., Ex. 8.)

[3] Those sales representatives are: Larry Ben-Egypt, Curt Flight, Melissa Hodgins, David Kenney, and Clifford Tyler. (Def.'s Mem. of Law at 2.).

4

## Discussion

Hewlett-Packard moves for summary judgment, seemingly conceding that it is obligated to pay Fiorello a cash amount under the program's terms,[4] but arguing that it fully performed its obligations when it paid him the $10,000 share. Fiorello objects. First, he challenges Drew Caola's affidavit, filed in support of the motion for summary judgment, on grounds that it does not meet the requirements of FED. R. CIV. P. 56(e), because it reports information that Caola learned from another Hewlett-Packard employee, Barry Hamilton.[5] Fiorello also says, half-heartedly, that because no mention was made of the award-sharing rule when his name was drawn, and because Hewlett-Packard cannot demonstrate that any employee was ever informed of that rule, the

---

[4] Although Hewlett-Packard intimates, in its supporting memorandum of law, that no legally enforceable agreement was formed between itself and plaintiff, its brief is almost exclusively devoted to the contention that it fulfilled its obligations. The court will, for now, assume that Hewlett-Packard undertook legally enforceable obligations in connection with the incentive program (e.g., under a contract theory, or a modification of the terms of employee-at-will compensation theory).

[5] Caola was Hewlett-Packard's Sales Program Manager. In that capacity, he designed and implemented the incentive program at issue. Barry Hamilton was Hewlett-Packard's Inside Sales Manager and was Fiorello's direct superior.

Company is somehow estopped from enforcing the published sharing rule against him. More substantively, perhaps, he denies that he was a member of a team that included the five outside sales representatives who shared the $100,000 prize, and claims he had an individual, rather than a team, quota. Finally, he argues that because outside sales representatives did not split orders with each other at a pre-determined rate, any team that included the outside sales representatives who shared the $100,000 award with plaintiff was not a team that "split orders at a predetermined rate."

Fiorello's suggestion that he is not subject to the bonus program's rules, published on the Hewlett-Packard web site, because he was personally uninformed of their full content, is of course without merit. The only possible obligations to Fiorello undertaken by Hewlett-Packard in connection with the promotion and award were those it created, as expressed in the contest rules posted on the web site. Fiorello may have no enforceable legal rights at all - contract or otherwise - under these circumstances, but if he has enforceable rights, they are commensurate with what Hewlett-Packard undertook to do, and

6

certainly cannot be enlarged based upon Fiorello's own failure to learn the full scope of what was undertaken. The terms to which Hewlett-Packard bound itself are plainly those announced on its web sites and quoted above.

At issue here, then, is the proper application of the so-called "sales team exclusion" rule, which required splitting the $100,000 bonus "[i]f the winner is a member of a team (with team quota) that consistently splits orders at a predetermined rate." As noted, Fiorello argues that he was not a member of a team, that he did not have a team quota, and that his purported team did not split orders.

Regarding his membership on a team, Fiorello gave the following deposition testimony:

Q. Back in the year 2000, you were an inside sales representative; is that correct?

A. Yes.

Q. Were you part of a sales team?

A. I was part of a sales team, yes.

Q. Describe for me what that sales team was.

7

A. Sales team means to me that you're sharing in the sales or selling process along the various aspects of that sales cycle.

Q. Is it true that inside sales representatives oftentimes supported the outside sales representatives in their sales efforts?

A. Support?  Could you expand on that?

Q. Sure.  Did you work together with outside sales representatives in trying to make a sale on Hewlett-Packard's behalf?

A. Yes.

Q. When you say you were part of a team, did the team have certain individuals that were on it at any one time?

A. Yes.

Q. And did these individuals change or were they set?

A. It changed.

. . .

Q. . . . do you recall who your team members were?

A. In the beginning of the year, the fiscal year, I believe Curt Flight would have been a team member; I believe Larry Ben-Egypt would have been a team member; Cliff Tyler would have been a team member; Dave Kenny would have been a team member; and Bev Pettit would have been a team member.

. . .

Q. Did your team have a name?

A. The Open View software sales team.

Q. Any shorthand?  Have you heard of something called SF 11?

A. Yes.

Q. What does that mean to you?

A. Sales force 11.

Q. Is that another name for your team?

A. Organizationally, yes.

(Def.'s Reply Mem., Ex. 2 (Fiorello Dep.) at 12-14.)  In an affidavit submitted in support of his objection to summary judgment, Fiorello states: "I have never been a member of any team that includes a Melissa Hodgins," (Fiorello Aff. ¶ 3.), but does not otherwise deny being a member of a sales team.  Because he has presented no facts tending to show that he was not a member of a sales team and, in fact, has testified that he was a member of a team, the undisputed factual record fully supports the legal conclusion that plaintiff was a member of a sales team.

With regard to splitting orders at a predetermined rate, Fiorello gave the following deposition testimony:

Q. Now, was there a quota arrangement among the team?

9

A. Yes.

Q. Can you describe – again, I'm trying to focus on the year 2000 unless I say otherwise, so I hope you understand that. Do you recall what the arrangement was for your team in the year 2000?

A. The quota arrangement was such that orders, you know, were split on a 90/10 fashion. So all business that came into the Northeast region in the district, the broader, the total district in the Northeast was spit 90/10; 90 percent was with the outside, mapped to the outside sales representative and 10 percent was split amongst the three inside sales representatives.
Essentially, that 10 percent component went to my boss, Barry Hamilton, as the inside sales manager of a district, and then below that was, again, the 10 percent component would be split amongst the three of us inside sales reps.

Q. So I want to make sure I understand. Say your team sells something, say you're the person who originates the sale as an inside sales rep. Money comes in, say it's $100 just for the sake of an example.
How is that $100 divvied up; does 90 of that $100 go to the outside sales representative and 10 of the $100 be split among the three inside sales representatives?

A. Yes.

(Def.'s Reply Mem., Ex. 2 (Fiorello Dep.) at 25-26.) In his

affidavit, Fiorello states:

In calendar year 2000, each Outside Sales Representative split his sales with Inside Sales, but not with me directly. Ninety percent (90%) of the sale credit went to the individual Outside Sales

10

Representative making the sale.  Ten percent (10%) went to Inside Sales.  The ten percent (10%) paid to "Inside Sales" was divided according to a formula developed by Barry Hamilton.

My sales, and consequently my performance in relation to quota, would have reflected some share of the ten percent (10%) attributed to Inside Sales from the sales made by all Outside Sales Representatives in the Northeast Region.  My performance against my individual quota was not limited to the sales made by the five (5) individuals awarded a portion of the $100,000 Performance Plus Bonus.

The Outside Sales Representatives did not share sales with one another, except on a joint account.  The Outside Sales Representative would receive ninety percent (90%) of the sales made by him or her for his or her own account.

(Pl.'s Obj. to Summ. J., Ex. 1 (Fiorello Aff.) ¶¶ 6-8.)  While plaintiff has produced evidence that outside sales representatives did not split orders among themselves, he has presented no facts tending to show that he did not split orders with outside sales representatives and has, in fact, testified that he did split orders with both outside and inside sales representatives.  Thus, the undisputed factual record fully supports a legal conclusion that plaintiff split orders according to a predetermined formula (90/10) with other sales representatives.

11

All that seemingly stands between defendant and judgment as a matter of law is the parenthetical phrase in the Program Rules: "with team quota."[6] According to the affidavit of Drew Coala:

> I was responsible for checking that Michael Fiorello was eligible for the Drawing, and for determining the proper payment in accordance with the Rules. I knew that Michael Fiorello is an inside sales representative, who ordinarily worked with outside sales representatives and shared quota with them. I made inquiries within HP to find out who were Fiorello's team members and what was his share of order splits. From Barry Hamilton, who was Fiorello's manager, I learned that quota credits were split 90/10, with 90% of the credit being assigned to the outside sales role and with 10% of the credit being assigned to the inside sales role.

(Def.'s Mot. Summ. J., Caola Dep. ¶ 9 (emphasis added).) In deposition testimony, John Bleuer, Hewlett-Packard's Northeast Region Sales Manager explained: "My understanding is that his [Fiorello's] quota would have been an algebraic calculation of

---

[6] Neither party offers a definition for the term "team quota," and as the record is currently developed, at least two possibilities present themselves. Quota might refer to a sales goal, as in "I have a quota to meet." The deposition testimony of both John Bleuer and Paul DiTucci appears to be based upon such a definition. (See Pl.'s Obj. to Summ. J., Ex. 4 (DiTucci Dep.) at 27-29 and Ex. 5 (Bleuer Dep.) at 33, 35.) Quota might also refer to sales results, as in "These five sales represent my quota for the month." Plaintiff's deposition testimony appears to be b (document no. 16) is denied ased upon such a definition. (See Def.'s Reply Mem., Ex. 2 (Fiorello Dep.) at 25-26.)

12

end user sales reps' quotas, some of which I would have set."
(Pl.'s Obj. to Summ. J., Ex. 5 (Bleuer Dep.) at 33.)  Bleuer went
on to testify that while he could not affirm it definitively, he
thought it was "mostly true" to say that "the only component of
Mike Fiorello's quota was products sold by people who worked for
[him]."  (Id.)  Regarding the establishment of goals for outside
sales representatives, Bleuer's District Manager, Paul DiTucci,
testified as follows:

> Q. I'm guessing at this.  You didn't pull these
> goals, I take it, out of mid-air; somebody gave you
> goals?
>
> A. Yes.  Our goal – my – I received my goal and
> then I provided a goal for the team.
>
> Q. Okay.
>
> A. For the individuals on my team.
>
> Q. Who set your goal?
>
> A. My manager, John Bleuer.
>
> Q. And how often did he set a goal for you?
>
> A. Annually.
>
> Q. And – and do you recall, was that on a calendar
> year basis?
>
> A. Yes.

13

Q. So sometime toward the end of one calendar year, Mr. Bleuer would give you a goal for your northeast region Open View product sales?

A. That is correct.

Q. Okay. And you would, in turn, I take it, break that goal into pieces for your five-person sales force?

A. That is correct.

(Pl.'s Obj. to Summ. J., Ex. 4 (DiTucci Dep.) at 27-28).

According to defendant's response to plaintiff's interrogatory number 7:

Barry Hamilton, District Manager, spoke with Mr. Fiorello shortly after the drawing and communicated to him that he may not receive the total amount of the bonus in light of the fact that he was on a shared team goal. Thereafter, Mr. Hamilton also told Mr. Fiorello that he would not receive the entire $100,000 himself, but would be sharing it with his team.

(Def.'s Mot. Summ. J., Buchanan Aff., Ex. 2 at 6.) In his affidavit, plaintiff states:

. . . My superior was Barry Hamilton. Mr. Hamilton set my salary, evaluated my performance, and established my bonus compensation. Mr. Hamilton also established my sales quota.

In calendar year 2000, I had an individual sales quota. At no time did I have a team quota.

14

(Pl.'s Obj. to Summ. J., Ex. 1 (Fiorello Aff.) ¶¶ 5-6.)

Fiorello's affidavit hints at potential issues of material fact sufficient to avoid summary judgment, at least on the record as it currently stands. He hints that there was no "team quota;" it is just a hint, however, and not a well-supported contention of fact. And, it is a hint seemingly contradicted by his supervisor, Hamilton, and by DiTucci, but not plainly and definitively. That Fiorello had an individual quota is, of course, not inconsistent with the proposition that his team also had a "team quota." While Hewlett-Packard witnesses suggest the team did have a quota, they do directly say so, or provide evidentiary support for the point. It matters, because Hewlett-Packard distributed the award among team members based in part on its determination that the team indeed had a team quota. The record requires further development on that point - it may be easy to do, but it is necessary before the court can resolve the pending issue as a matter of law.

## Conclusion

For the reasons given, defendant's motion for summary judgment (document no. 16) is denied, albeit without prejudice to refiling

15

a well-supported motion addressing the factual issue raised. Plaintiff's Rule 56(f) (document no. 22) motion is denied as moot because it appears the desired discovery has now been had, and, in any event, because the motion for summary judgment has been denied. The case shall remain on track for trial. That said, there appears to be little left of this case to try, assuming the "team quota" issue cannot be resolved on dispositive motions.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

December 22, 2004

cc:  John R. Baraniak, Jr., Esq.
      John V. Dwyer, Esq.
      Michael J. Fontaine, Esq.